**AMERICAN AIRLINES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 04–1736C.**

United States Court of Federal Claims.

Nov. 30, 2005.

Adam P. Feinberg, Miller & Chevalier Chartered, Washington, D.C., counsel for Plaintiff.

Kyle Eric Chadwick, United States Department of Justice, Washington, D.C., counsel for Defendant.

## MEMORANDUM OPINION AND ORDER

BRADEN, Judge.

Plaintiff American Airlines, Inc. ("American Airlines" or "AA") seeks to recover at least $2,627,974.12 that the Departments of Homeland Security and Agriculture imposed on commercial airlines, pursuant to two statutory schemes: the Immigration User Fee Statute, 8 U.S.C. §§ 1356, *et. seq.,* and the Agricultural Quarantine Inspection User Fee Statute, 21 U.S.C. § 136(a).

## RELEVANT FACTS AND BACKGROUND [1]

### A. The Immigration User Fee.

In 1986, Congress enacted the Immigration User Fee Statute [2] that requires an entity issuing tickets to passengers traveling into the United States aboard commercial vessels or commercial aircraft to collect and remit a $7.00 "user" fee ("Immigration User Fee"). This statute further requires that, if a ticket

---

1. Facts recited herein were derived from: the December 6, 2004 Complaint ("Compl."); the Government's March 11, 2005 Motion to Dismiss ("Gov't Mot. to Dismiss"); Plaintiff's April 14, 2005 Cross–Motion for Partial Summary Judgment ("Pl.Cross–Mot."), Plaintiff's Proposed Findings of Fact ("Pl.Findings"); Plaintiff's Factual Appendix thereto ("Pl.App."); the Government's May 26, 2005 Response to Plaintiff's Motion ("Gov't Resp."), the Government's Response to Plaintiff's Proposed Findings of Fact ("Gov't Findings"); and the Government's Factual Appendix thereto ("Gov't App."); Plaintiff's June 27, 2005 Reply Brief ("Pl.Reply"); and the November 8, 2005 oral argument ("TR ___").

2. Section 1356(f) requires:

(1) Each person that issues a document or ticket to an individual for transportation by a commercial vessel or commercial aircraft into the United States *shall*—(A) *collect* from that individual the fee ... at the time the document or ticket is issued[.]
(2) If—(A) a document or ticket for transportation of a passenger into the United States is issued in a foreign country ... and (B) the fee ... is not collected at the time such document or ticket is issued[,] the person providing transportation to such passenger *shall collect* such fee at the time such passenger departs from the United States and shall provide such passenger a receipt for the payment of such fee.
8 U.S.C. §§ 1356(f)(1), (2) (emphasis added).

is issued in a foreign country and the fee has not been collected by the ticket issuer, the entity providing transportation, is obligated to collect the fee from the passenger [3] at the point of departure from the United States.[4] *See* 8 U.S.C. § 1356(f)(1). The Immigration User Fee is used by the Department of Homeland Security [5] to pay for inspection, detentions, and other expenses associated with the arrival of all passengers into the United States. *See* 8 U.S.C. §§ 1356(d), (k).[6]

## B. The Agricultural Quarantine Inspection User Fee.

In 1990, Congress enacted Section 2509 of the Food Agriculture, Conservation and Trade Act of 1990, as amended by the Federal Agricultural Improvement and Reform Act, Pub.L. No. 104–127, § 917, 110 Stat. 888, 1187 (codified at 21 U.S.C. § 136a) ("the Agriculture Statute"), authorizing the Secretary of Agriculture ("the Secretary") to impose a fee to cover the cost of agricultural quarantine and inspection services. Pursuant thereto, the Secretary issued regulations to establish an "Agricultural Quarantine Inspection User Fee" ("AQI User Fee"),[7] to be paid by passengers,[8] but collection was imposed only on entities issuing international airline tickets or airline carriers similar to

**3.** The Immigration User Fee Statute specifies a number of categories of passengers who are exempt from paying the Immigration User Fee, including when their travel originates in Canada, Mexico, within the United States, to a destination outside the United States, or when inspection services are not provided. *See* 8 U.S.C. § 1356(e).

**4.** During the regulatory comment period, the airline industry anticipated increased costs and difficulties with Immigration User Fee collection. *See Immigration User Fee*, 53 FED. REG. 5,756, 5,756 (Feb. 26, 1988) ("Numerous commenters expressed concern about the responsibility for collection of the immigration user fee upon departure of a passenger ... [and] concern about the reporting and audit requirements.").

**5.** On March 1, 2003, the Immigration and Naturalization Service ("INS"), formerly within the Department of Justice and under the control of the Attorney General, was folded into the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub.L. No. 107–296, 116 Stat. 2135 (Nov. 25, 2002).

**6.** Effective November 28, 2001, the Immigration User Fee was increased from $6.00 to $7.00 per individual. *See* 8 U.S.C. § 1356(d) (1998) (authorizing the collection of "$7[.00] per individual for the immigration inspection of each passenger arriving at a port of entry in the United States, or for the preinspection of a passenger in a place outside of the United States prior to such arrival, aboard a commercial aircraft or commercial vessel").

**7.** The AQI User Fee shall be collected in the following circumstances:

(i) When through tickets or travel documents are issued indicating travel to the ... United States which originates in any location other than Canada; (ii) When through tickets or travel documents are issued in Canada indicating an arrival in ... the United States following a stopover (layover) in a location other than Canada; and (iii) When passengers arrive in ... the United States in transit from a location other than Canada and are inspected by [the Animal and Plant Health Inspection Service ("APHIS")] or Customs.

7 C.F.R. §§ 354.3(f)(3)(i), (ii), (iii). The implementing regulations further specify that:

Any person who issues tickets or travel documents on or after May 13, 1991, is responsible for collecting the AQI user fee from all passengers transported into ... the United States to whom the AQI user fee applies. (A) Tickets or travel documents must be marked by the person who collects the AQI user fee to indicate that the required AQI user fee has been collected from the passenger. (B) If the AQI user fee applies to a passenger departing from the United States and if the passenger's tickets or travel documents were issued on or after May 13, 1991, but do not reflect collection of the AQI user fee at the time of issuance, then the carrier transporting the passenger from the United States must collect the AQI user fee upon departure.

7 C.F.R. §§ 354.3(f)(4)(i).

**8.** The following categories of passengers are exempt from paying the AQI User Fee:

(i) Passengers arriving from Canada whose journey originates in Canada; (ii) Crew members who are on duty on a commercial aircraft; (iii) Airline employees, ... who are traveling on official airline business; (iv) Diplomats, except for United States diplomats ...; (v) Passengers departing and returning to the United States without having touched a foreign port or place other than Canada; (vi) Passengers arriving on any commercial aircraft used exclusively in the governmental service of the United States or a foreign government ... so long as the aircraft is not carrying persons or merchandise for commercial purposes. Pas-

the Immigration User Fee program.[9]  *See* 7 C.F.R. § 354.3(f) (2005).  The AQI User Fee is used by the Department of Agriculture's Animal and Plant Health Inspection Service ("APHIS") to pay for quarantine and inspection activities and has ranged from $1.45 per individual, per ticket to $3.10 per individual, per ticket.  *See* 7 C.F.R. § 354.3(f) (2003); *see also* 7 C.F.R. § 354.3(f) (2000); 7 C.F.R. § 354.3(f) (1998); 7 C.F.R. § 354.3(f) (1996).

## C. Government Audits Of American Airlines.

Since 1998, the Government has conducted audits of American Airlines' compliance with the Immigration User Fee and AQI User Fee collection and remittance obligations. *See* Gov't Findings ¶ 2; *see also* 8 C.F.R. § 286.5(f) (2005) (reserving the right to conduct an independent audit "to assure the accuracy of the remittances of [Immigration User] [F]ees collected ... compliance with the applicable statutes and regulations."); 7 C.F.R. § 354.3(f)(7) (2005) (reserving the right to "verify the accuracy of the AQI user fees collected and remitted and to otherwise determine compliance with 21 U.S.C. [§ ] 136a.").  During an audit, a sampling of tickets from American Airlines' flights during a specified period is reviewed to ascertain whether both user fees were collected.  *See* Gov't Findings ¶ 6. A ticket without evidence of collection of the fee initially is designated a "potential error."  *Id.* Unless American Airlines is able to furnish evidence of fee collection, the ticket is designated an "error."  *Id.* An "error rate" is then derived from the sampling and applied to the total number of tickets on all American Airlines flights, within a relevant period, as an estimate of the number of passengers for whom American Airlines did not remit a fee to the Government.  *Id.* In each audit period, the Government verified that American Airlines remitted user fees for at least 97.53% of the passengers obligated by statute to pay such fees.  *Id.* ¶¶ 19, 24, 29, 38, 45, 50, 55, 59, 65. During the audit periods selected by the Government, American Airlines' aggregate remittance rate exceeded 99%.  *Id.*

American Airlines contends that the 1% error rate, identified by the audits, was caused by difficulties in collecting fees from some passengers, particularly those originating from Central and South American countries.[10]  *See* Pl. Findings ¶¶ 11, 13–16.  The Government counters that the "errors" should be attributed to American Airlines' failure to remit user fees that were collected.  *See* Gov't Resp. at 18.  At this juncture, the court is unable to ascertain the number of fees that American Airlines was unable to collect and remit or the reasons collection did not occur.  Similarly, the court is unable to determine the number of fees that American Airlines was able to collect but failed to remit.

## D. Fees Disputed By American Airlines.

After each audit, the Government demanded and American Airlines voluntarily paid all Immigration User Fees and AQI User Fees that the Government alleged were due, but

sengers on commercial aircraft under contract to the United States Department of Defense (DOD) are exempted ...; (vii) Passengers arriving on an aircraft due to an emergency or forced landing when the original destination of the aircraft was a foreign port; (viii) Passengers ... not subject to inspection; and (ix) Passengers moving from the United States Virgin Islands to Puerto Rico.
7 C.F.R. § 354.3(f)(2) (2005).

9.  During the regulatory comment period, the airline industry anticipated increased costs and difficulties with AQI User Fee collection.  *See* Animal and Plant Health Inspection Service User Fees, 56 Fed. Reg. 14,837, 14,839 (Apr. 12, 1991) ("Some comments stated that the fees would increase their cost of doing business .... [More-

over,] [n]umerous comments stated that it is impractical to collect user fees from airline passengers at the time they depart ... and major delays could occur as a result of this.)"

10.  American Airlines claims "[s]ome passengers and travel agencies from these countries claim that either their country's laws prohibit, or its sovereignty would be injured, if the United States or its agents collected any fees or taxes from their country's citizens."  Pl. Findings ¶ 13 (citing Hobbs Decl. ¶ 17; Pl.App. at 004).  American Airlines also asserts that some of these foreign passengers, "who did not pay user fees when they purchased their tickets[,] also refuse[d] to pay the user fees at the airport, even after being asked to do so by AA personnel" *Id.* ¶ 15 (citing Hobbs Decl. ¶ 18; Pl.App. at 004).

not remitted.[11] *See* Gov't Findings ¶¶ 7, 8.

On October 10, 2003, American Airlines requested that APHIS refund all amounts that American Airlines was compelled to pay, pursuant to the AQI User Fee audits, because the Government did not have statutory or regulatory authority to mandate that American Airlines remit uncollected fees. *Id.* ¶ 76. On August 11, 2004, APHIS denied American Airlines' request. *Id.* ¶ 77.

On October 13, 2003, American Airlines requested that the Department of Homeland Security refund all amounts that it was compelled to pay, pursuant to the Immigration User Fee audits, because the Government did not have statutory or regulatory authority to mandate that American Airlines remit uncollected fees. *Id.* ¶ 74. On August 5, 2004, American Airlines' request was denied. *Id.* ¶ 75.

### PROCEDURAL BACKGROUND

On December 6, 2004, American Airlines filed a Complaint in the United States Court of Federal Claims challenging the Government's authority to require payment of uncollected Immigration User Fees and AQI User Fees. *See* Compl. ¶¶ 5, 7, 13–15. Count One alleges that the Government illegally exacted sums by compelling American Airlines to pay Immigration User Fees that it was unable to collect. *Id.* ¶¶ 74–77. Count Two alleges the Government illegally exacted sums by compelling American Airlines to pay AQI User Fees that it was unable to collect. *See id.* ¶¶ 78–81.

Count Three alleges that the Government effected an unconstitutional taking of American Airlines' private property for public use, without just compensation by compelling American Airlines to pay uncollected Immigration User Fees. *Id.* ¶¶ 82–84. Count Four alleges that the Government effected an unconstitutional taking of American Airlines' private property for public use, without just compensation by compelling American Airlines to pay uncollected AQI User Fees. *Id.* ¶¶ 85–87.

On March 11, 2005, the Government filed a Motion to Dismiss each count of the Complaint for failure to state a claim upon which relief may be granted. *See* RCFC 12(b)(1), (6). Therein, the Government argued that both agencies properly required payment from American Airlines for all covered passengers, regardless of whether the fee was in fact collected. *See* Gov't Mot. to Dismiss at 10–12, 17–19. In addition, the Government asserted that the court does not have jurisdiction over a portion of Count Two, concerning AQI User Fees collection activities since October 1, 2002, because the related quarantine and inspection activities are a non-appropriated fund instrumentality ("NAFI").

On April 14, 2005, American Airlines filed a Cross–Motion for Partial Summary Judgment as to liability on Counts One and Two, wherein the court was asked to conclude, as a matter of law, that the Government did not have statutory authority to impose liability on American Airlines for user fees owed by

---

11. . A summary of the additional sums that the Government demanded and collected from American Airlines, as a result of audits regarding the Immigration User Fee, follows:

| Audit Date | Time Period | Liability Assessed |
| --- | --- | --- |
| September 2000 | July 1, 1998 to June 30, 2000 | $397,844.00 |
| January 2002 | July 1, 2000 to December 31, 2001 | $160,878.00 |
| March 2003 | January 1, 2002 to December 31, 2002 | $603,840.00 |
| August 2004 | January 1, 2003 to June 30, 2004 | $270,274.00 |

*See* Gov't Findings ¶¶ 17–40.

A summary of the additional sums that the Government demanded and collected from American Airlines, as a result of audits regarding the AQI User Fee, follows:

| Audit Date | Time Period | Liability Assessed |
| --- | --- | --- |
| October 1998 | July 1996 to June 1998 | $150,572.48 |
| September 2000 | July 1998 to June 2000 | $299,106.51 |
| February 2002 | October 1, 2000 to December 31, 2001 | $345,936.76 |
| 2003 | January 1, 2002 to December. 31, 2002 | $298,298.37 |
| August 2004 | January 1, 2003 to June 30, 2004 | $101,224.00 |

*Id.* ¶¶ 43–69.

its passengers that allegedly American Airlines was unable to collect. *See* Pl. Cross–Mot. at 15–29. On April 14, 2005, American Airlines also voluntarily dismissed the constitutional claims asserted in Counts Three and Four. *Id.* at 15 n. 5 ("AA will not pursue its Fifth Amendment takings allegation in Count III and IV of its Complaint."). American Airlines stated that "[a]t some later stage, the parties and the Court can determined how many of the fees AA paid through the Government's audit assessments represent fees AA in fact did not collect." *Id.* at 35.

On May 26, 2005, the Government filed a Response.[12] On June 27, 2005, American Airlines filed a Reply.

On October 7, 2005, during a telephone status conference with the parties, the court expressed concern that the Government's NAFI argument was not persuasive, as a result of independent research from the *Congressional Record.* At a November 8, 2005 oral argument, the Government voluntarily withdrew the jurisdictional challenge to Count Two, pursuant to RCFC 12(b)(1). *See* TR 4 ("We actually came prepared not only to accept your invitation not to argue the NAFI issue, but we're going to withdraw that argument this morning."). On November 8, 2005, the court held an oral argument on the outstanding motions.

## DISCUSSION

### A. Jurisdiction.

The United States Court of Federal Claims has jurisdiction, pursuant to the Tucker Act, to adjudicate claims "against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States[.]"· 28 U.S.C. § 1491(a)(1) (2005). The Tucker Act also provides the

court with jurisdiction to entertain an illegal exaction claim, based on an asserted statutory power. *See Telecare Corp. v. Leavitt,* 409 F.3d 1345, 1348 (Fed.Cir.2005) (quoting *Aerolineas Argentinas v. United States,* 77 F.3d 1564, 1573 (Fed.Cir.1996)) (stating that "[t]he Tucker Act provides jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power.").

The court has determined it has jurisdiction to adjudicate Counts One and Two of the Complaint, concerning American Airlines' claim that the Departments of Homeland Security and Agriculture did not have statutory or regulatory authority to impose liability on American Airlines for payment of the user fees at issue.

### B. Applicable Standards Of Review.

#### 1. Standard For Decision On Motion To Dismiss For Failure To State A Claim—RCFC 12(b)(6).

In ruling on a motion to dismiss, the court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir.1995) (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236–37, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)); *see also Sommers Oil Co. v. United States,* 241 F.3d 1375, 1378 (Fed.Cir.2001) (citations omitted) ("When reviewing a dismissal for failure to state a claim upon which relief can be granted under ... Rule 12(b)(6) ... [the court] must accept as true all the factual allegations in the complaint, and ... indulge all reasonable inferences in favor of the non-movant."). Dismissal for failure to state a claim under Rule 12(b)(6) "is proper only when a plaintiff can 'prove no set of facts in support of his claim which would entitle him to relief.' "

---

12. The Government argued that the equitable doctrines of laches, equitable estoppel, and/or accord and satisfaction may bar recovery in this case. *See* Gov't Resp. at 21 n. 2 ("We have not filed a cross-motion requesting the Court to rule definitively upon these affirmative defenses. Our point, instead, is that equitable defenses are plainly *triable* and, therefore preclude finding liability at this stage.") (emphasis in original); TR 27 ("We've also alluded to some equitable

defenses, which we're not asking the Court to resolve but we're simply putting on the table to show that if this case went beyond our motion, beyond the legalities of the motion to dismiss and got into facts, there would be a wealth of factual and equitable issues that we would need some time and some discovery to explore."). To date, however, the Government has not filed an Answer asserting these defenses.

*Adams v. United States,* 391 F.3d 1212, 1218 (Fed.Cir.2004) (quoting *Leider v. United States,* 301 F.3d 1290, 1295 (Fed.Cir.2002)); *see also* RCFC 12(b)(6).

Although termed a Rule 12(b)(6) failure to state a claim motion, the Government's Motion to Dismiss asks the court to make a legal determination, namely that the statutes and regulations permit the Government to require remittance of 100% of the Immigration User Fees and AQI User Fees for all covered passengers, regardless of whether the fee was in fact collected. Solely for the purpose of resolving the Government's argument, the court assumes that the Government has required American Airlines to pay the relevant user fees, even where American Airlines in fact did not collect the fees from passengers.

**2. Standard For Decision On Summary Judgment—RCFC 56(c).**

Summary judgment is appropriate "only if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." *Am. Pelagic Fishing Co. v. United States,* 379 F.3d 1363, 1370–71 (Fed. Cir.2004) (citing RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In the United States Court of Federal Claims, summary judgment, albeit "interlocutory in nature, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." RCFC 56(c); *see also United States v. Winstar Corp.,* 518 U.S. 839, 910, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (affirming grant of partial summary judgment on contract liability and remanding the determination of the appropriate measure or amount of damages, if any). Only genuine disputes of material facts that might affect the outcome of the suit will preclude entry of summary judgment. *See Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted . . . .

That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."). The existence of "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id.* Therefore, there is no issue for the court to adjudicate unless the nonmoving party puts forth evidence sufficient for a jury to return a verdict for that party; but "if the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

The burden of demonstrating the absence of any genuine issue of material fact is on the party moving for summary judgment. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (holding that the moving party may meet its burden "by 'showing'—that is, pointing out to the [trial court] that there is an absence of evidence to support the nonmoving party's case."). A motion for summary judgment may be made without supporting affidavits and rely "solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* at 324, 106 S.Ct. 2548. Once the moving party demonstrates the absence of a genuine issue of material fact, however, the burden shifts to the non-movant to show the existence of a genuine issue for trial. *See Novartis Corp. v. Ben Venue Laboratories,* 271 F.3d 1043, 1046 (Fed.Cir.2001) (explaining that, once the movant has demonstrated the absence of a genuine issue of material fact, "the burden shifts to the non-movant to designate specific facts showing that there is a genuine issue for trial."). A dispute over a material fact is "genuine" where a reasonable fact-finder could find for the non-movant. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

A trial court is required to resolve all doubt over factual issues in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In doing so, all reasonable inferences and presumptions must be resolved in favor of the

non-moving party. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Caterpillar Inc. v. Deere & Co.,* 224 F.3d 1374, 1379 (Fed.Cir. 2000) ("When ruling on a motion for summary judgment, all of the nonmovant's evidence is to be credited, and all justifiable inferences are to be drawn in the nonmovant's favor."); *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.,* 60 F.3d 770, 773 (Fed.Cir.1995) (requiring the trial court to view the evidence in a light most favorable to the non-moving party and to draw all reasonable inferences in favor of the non-moving party).

## C. Applicable Precedent Regarding Statutory And Regulatory Construction.

■ The starting point in construing a statute is the plain and ordinary meaning of the words used. *See Lamie v. United States Tr.,* 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000)) ("When the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."); *see also Guillebeau v. Dep't of the Navy,* 362 F.3d 1329, 1336 (Fed.Cir.2004) (quoting *Lamie,* 540 U.S. at 534, 124 S.Ct. 1023) (adopting the principle set forth in *Lamie*).

■■ In construing a regulation, however, the court first must determine whether Congress has authorized the agency to promulgate rules carrying the force of law. *See United States v. Mead,* 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (holding that a court must determine an agency's interpretation of a statute to be reasonable and afford deference to such interpretation, "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."). An agency's interpretation of its own regulations is given "controlling weight unless [the interpretation] is plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); *see also Krizman v. Merit Sys. Prot. Bd.,* 77 F.3d 434, 439–440 (Fed.Cir.1996) (citations omitted) ("[T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."). If a different reading to that of the administrative agency is compelled by the regulation's plain language, deference to the agency is not required. *See Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (quoting *Gardebring v. Jenkins,* 485 U.S. 415, 430, 108 S.Ct. 1306, 99 L.Ed.2d 515 (1988)) ("In other words, we must defer to the Secretary's interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.' ").

## D. The Court's Resolution Of The Government's Motion To Dismiss And Plaintiff's Cross–Motion For Summary Judgment.

American Airlines argues the Government has misinterpreted or misapplied statutory authority by imposing liability on American Airlines for user fees that allegedly it has been unable to collect. The Government contends that the statutes and regulations render American Airlines "responsible for collecting, retaining and remitting *all* applicable user fees for *all* international airline passengers (subject to exceptions that are not pertinent to the complaint)" regardless of whether American Airlines has collected those fees. Gov't Mot. to Dismiss at 6 (emphasis in original). The Government further argues that American Airlines' reading of the statute is contrary to Congress' plain intent because it enables American Airlines, without consequences, to short-circuit the law by simply not collecting fees from passengers to whom the fee regimes apply.[13] *Id.*

---

**13.** During the November 8, 2005 oral argument, the Government conceded that the Immigration User Fee Statute, the Agriculture Statute, and accompanying regulations create an incentive for American Airlines to collect as many user fees as possible, because American Airlines retains any interest that it earns from the user fees between the time of collection and remittance to the Gov-

The Government's Motion to Dismiss and Plaintiff's Cross–Motion for Partial Summary Judgment turn upon a question of statutory and regulatory interpretation: whether the applicable statutes and regulations allow the Government to impose liability on American Airlines to pay Immigration User Fees and AQI User Fees that American Airlines did not collect from passengers.

**1. The Government Does Not Have Authority To Impose Liability On American Airlines For The Payment Of Any Uncollected Immigration User Fees.**

■ The Immigration User Fee Statute requires that ticket issuers and airline carriers *collect* user fees from applicable passengers and remit *collected* fees. *See* 8 U.S.C. § 1356(f)(1) (emphasis added). No language therein imposes liability on commercial airlines to pay user fees that are not collected. *Id.* Section 1356(f)(3) provides only that "[t]he person who collects fees ... shall *remit those fees.*" 8 U.S.C. § 1356(f)(3) (emphasis added). This text permits only one reading: collected fees must be remitted to the Government. *Id.* In addition, the implementing regulations are consistent with the statute. *See* 8 C.F.R. § 286.5(a) (2005) ("The air or sea carrier whose ticket stock or document for transportation *reflects collection of the fee* is responsible for remittance[.]") (emphasis added); *see also* 8 C.F.R. § 286.5(c) (2005) (obliging those making remittances to provide statements of the "total *amount collected and remitted*") (emphasis added); 8 C.F.R. § 286.5(f) (2005) (authorizing the Government to conduct audits to assure the accu-

racy of "remittances of *fees collected and remitted*[.]") (emphasis added); 8 C.F.R. § 286.6 (2005) (obligating the collector and remitter to maintain records to verify the accuracy of fees "*collected and remitted*") (emphasis added).

It is also significant that the Government anticipated less than a 100% collection rate. The implementing regulations specifically require carriers to provide the Government with information about any passenger refusing to pay the fee. *See* 8 C.F.R. § 286.4(c) (2005) ("If at the time of departure such a passenger refuses to pay the fee, the carrier shall record the full name, complete address, nationality, passport number, and alien file number, if any, of the passenger and immediately notify the Associate Commissioner, Finance.").[14] The Government's contention that carriers, in effect, become secondarily liable to pay fees which remain uncollected is contradicted by this notification requirement. *Id.* The purpose of providing the Associate Commissioner with information about passengers who refuse to pay is to facilitate enforcement. If the carrier was liable for the fees, providing that information would serve no purpose. The applicable regulations also provide specific penalties for those who fail to comply with collection duties.[15] *See* 8 C.F.R. § 286.7 (2005). Those penalties, however, do not include the imposition of any liability on the carriers to pay uncollected fees. Therefore, the Government's litigation-driven regulatory interpretation requires the court to impose a penalty on carriers that is not authorized by statute or required by regulation.

ernment. *See* TR 21–22, 32–34, 36–37; *see also infra* Discussion, Part D(3), at 15 (discussing the incentive created by the collectors of the user fee(s) being able to collect the interest on the fee(s) collected prior to quarterly remittance).

14. The pleadings do not address whether American Airlines has complied with the notification requirements of 8 C.F.R. § 286.4(c). The question of compliance with this provision, however, is not before this court.

15. Carriers that fail to comply with the collection and remittance responsibilities may be subject to (a) the termination of agreements between the carrier and the Government that permit the car-

rier to transport aliens without visas through the United States to foreign destinations and/or (b) the suspension of enroute passenger inspections or pre-inspections prior to arrival in the United States, which assist airlines by enabling their passengers to make connecting flights without having to go through the immigration process on landing. *See* 8 C.F.R. § 286.7 (2005) ("Failure of any air or sea carrier to comply with the provisions of section 286 of the Act and this part shall subject it to one or more of the following: (a) Termination of existing agreements under the provisions of section 238 of the Act; and (b) Suspension of enroute inspections or preinspections.").

The Government also argues that American Airlines' interpretation would leave carriers free to circumvent liability for user fees simply by not collecting them. *See* Gov't Mot. to Dismiss at 13–16; Gov't Resp. at 14. Although that maybe so, there is no evidence in this record that American Airlines, with an aggregate compliance rate in excess of 99%, failed to act other than with reasonable diligence in collecting user fees from passengers.

The plain meaning of the Immigration User Fee Statute requires that the court deny the Government's Motion to Dismiss Count One and, provided no genuine issue of material fact exists, grant Plaintiff's Cross–Motion for Partial Summary Judgment on Count One.

**2. The Government Does Not Have Authority To Impose Liability On American Airlines For The Payment Of Any Uncollected AQI User Fees.**

The Government contends that Count Two, alleging an illegal exaction of AQI User Fees, should be dismissed for substantially the reasons to those raised to attack Count One. *See* Gov't Mot. to Dismiss at 20–24. The court rejects the Government's argument on similar grounds.

The Agriculture Statute provides that Secretary with the authority to proscribe fees to cover the cost of providing agriculture quarantine and inspection services and to impose collection and responsibilities on third parties. *See* 21 U.S.C. § 136a(a)(1) ("The Secretary of Agriculture may prescribe and collect fees sufficient—(A) to cover the cost of providing agricultural quarantine and inspection services ...."); *see also* 21 U.S.C. § 136a(a)(3) ("Fees collected ... by any person on behalf of the Secretary are held in trust for the United States and shall be remitted to the Secretary in such manner and at such times as the Secretary may prescribe."). This statute plainly requires that collectors act "on behalf of" the Government. *See* 21 U.S.C. § 136a(a)(3).

In addition, the Agriculture Statute authorizes the Secretary to "prescribe such regulations as the Secretary determines necessary" to carry out the provisions of section 136a. *See* 21 U.S.C. § 136a(d). Again, the plain meaning of the AQI User Fee Regula-

tions is inopposite to the interpretation that the Government now seeks to advance.

The AQI User Fee regulations provide that *"each passenger* aboard a commercial aircraft who is subject to inspection ... upon arrival from a place outside the customs territory of the United States *must pay an APHIS user fee."* 7 C.F.R. § 354.3(f)(1) (2005) (emphasis added). The liability to pay this fee is imposed on the passenger, not upon commercial airlines that are required only to collect and to remit any fees collected. Therefore, there is no support for the Government's argument that carriers are obliged to pay to the Government fees that have not been collected from passengers. The implementing regulations provide that "AQI user fees collected from international passengers ... shall be held *in trust* for the United States by the person collecting such fees, by any person holding such fees, or by the person who is ultimately responsible for remittance of such fees to APHIS[.]" 7 C.F.R. § 354.3(f)(4)(c) (2005) (emphasis added). But, the regulations governing remittance expressly relate only to fees that have been collected. *See* 7 C.F.R. § 354.3(f)(5)(i) (2005) ("The carrier whose ticket stock or travel document reflects collection of the AQI user fee must remit the fee"); 7 C.F.R. § 354.3(f)(5)(ii) (2005) ("AQI user fees must be remitted ... for receipt no later than 31 days after the close of the calendar quarter in which the AQI user fees were collected."). No liability for payment is imposed on commercial aircraft. Accordingly, the court rejects the view that an obligation to pay uncollected fees necessarily arises by silent implication from the obligation to collect.

Therefore, the plain meaning of the AQI User Fee regulations requires the court to deny the Government's Motion to Dismiss Count Two and, provided no genuine issue of material fact exists, grant Plaintiff's Cross–Motion for Partial Summary Judgment on Count Two.

**3. Contrary To The Government's Assertion, There Is No Genuine Issue Of Material Fact, Permitting Summary Judgment.**

The Government argues that American Airlines is not entitled to summary judgment

concerning liability because "material facts vital to American's claims are genuinely in question." Gov't Resp. at 17. In particular, the Government maintains that "[t]he record is devoid of probative or reliable evidence ... that American did not collect the ... user fees at issue—as opposed to collecting the fees from passengers, but failing to *document* collection." *Id.* (emphasis in original). The Government further asserts that the record fails to describe even one instance of a passenger refusing American Airlines' request to pay the user fee(s). *Id.* at 18.

The Government's argument is flawed because, for the purposes of resolving this motion for *partial* summary judgment, it is not necessary for the court to make factual determinations about the effectiveness of American Airlines' fee collection efforts, the extent of any difficulties experienced by American Airlines in collecting fees, or the reasons for any such difficulties. Rather, in order to secure a judgment on liability, American Airlines need only establish that the Government exacted at least one fee that American Airlines was unable to collect. *See* Pl. Reply at 20 ("[A]ll AA need show at this point is that ... [at] least one user fee was not collected[.]"). Significantly, the parties do not dispute that, after each audit, American Airlines made an additional payment to the Government to cover the user fees that were not collected. *See* Gov't Findings ¶¶ 7, 8.

Because the Complaint is premised on the theory that the Government illegally has exacted from American Airlines sums that it has been unable to collect from its passengers, the only legal question that the court is asked to resolve is whether a material dispute exists as to whether at least a portion of one of American Airlines' payments to the Government involves an uncollected user fee. The record contains sufficient evidence for the court to answer this question in the negative.

American Airlines points to the "error rate" identified in the Government's audits to evidence the number of tickets, within a sample of all tickets sold by American Airlines, for which there was no evidence of fee collection. *Id.* ¶ 6. The Government correctly points out that the methodology of the audits is designed to record instances in which collection has not been documented by American Airlines, rather than instances in which fees have not in fact been collected. *See* Gov't Resp. at 19–20 ("The audit reports are not probative evidence of actual noncollection, however: The audits were never designed to distinguish instances in which a user fee was not collected, from instances in which the fee was collected, but not recorded.").

American Airlines explains, and the Government does not dispute, however, that most of the tickets that lack evidence of fee collection are for travel into Central and South American countries. *See* Pl. Findings ¶ 29 (citing Hobbs Decl. ¶ 32); *see also* Gov't Findings ¶ 29. Specifically, the "error rate" for the Central and South America regions was more than five times greater than the "error rate" for the rest of the world. *Id.* Together with American Airlines' explanation that collection is particularly difficult in these regions, the results of the audits support American Airlines' assertion that at least some of the user fees were not collected. *See* Pl. Findings ¶¶ 11, 13–16; *see also supra* note 10.

The Declaration of Monty Hobbs ("Hobbs Declaration")[16] further supports American Airlines' contention that it has paid the Government for all uncollected fees. *See* Pl.App. at 001–013. Mr. Hobbs explains that, after receiving the Government's August 2004 audit report of the APHIS User Fees, he "reviewed AA's records to determine if any of the three 'errors' ... [identified in the report] represented an instance in which AA collected the [AQI] User Fee." *Id.* at 012–13 (Hobbs Decl. ¶ 76). Mr. Hobbs recounts that, by cross referring the three tickets counted as "errors" with American Airlines' records, he was able to verify that American Airlines did not collect any fees for any of the three tickets. *Id.* The Government chal-

---

**16.** Mr. Hobbs is a Manager in the Revenue Accounting Department at American Airlines, and has served as American Airlines' primary contact regarding all of the Government's user fee audits since October 2001. Pl.App. at 001–02 (Hobbs Decl. ¶¶ 2, 6).

lenges the Hobbs Declaration, suggesting that the "basis for Mr. Hobbs's assertions that three errors found in one audit reflect noncollection is entirely opaque[.]" Gov't Resp. at 20; *see also* Gov't Resp. at 18 ("Noting in the Hobbs [D]eclaration, however, suffices to satisfy American's burden under [Rule] 56(h)(1) to present a *prima facie* case that there exist no disputes of fact concerning whether, and how, often, its passengers actually refuse to pay user fees.") (emphasis in original).

Both statutes, and their accompanying regulations, provide American Airlines with an incentive to collect as many of the user-fees as it can. Collectors of Immigration User Fees and AQI User Fees are required to remit to the Government the sums collect on a quarterly basis. *See* 8 U.S.C. § 1356(f)(3); 21 U.S.C. § 136(a)(3); 7 C.F.R. §§ 354.3(f)(4)(c), (5)(i)-(ii) (2005); 8 C.F.R. § 286.5 (2005). The collectors, therefore, are permitted to earn interest on the money from the time of collection and to the date of remittance. *See* TR 21–22, 32–34, 36–37. The parties agree, that this provides collectors, such as American Airlines, with a financial incentive to collect the user fees from its passengers. *Id.*

The court has determined that the pleadings, together with the Hobbs Declaration and the incentives for compliance discussed above, are sufficient to discharge American Airlines' burden to demonstrate the absence of a genuine issue of material fact as to whether the Government has exacted from American Airlines any fee which American Airlines has not collected for its passengers.[17]

Because American Airlines has carried its burden of demonstrating the absence of a genuine issue of material fact, American Airlines is entitled to summary judgment as a matter of law on Counts One and Two.

## CONCLUSION

For the aforegoing reasons, the Government's March 11, 2005 Motion to Dismiss is

DENIED; and American Airlines' April 14, 2005 Cross–Motion for Partial Summary Judgment on Counts One and Two is **GRANTED.**

**IT IS SO ORDERED.**

---

**17.** In the alternative, the Government ask the court to grant a continuance, pursuant to Rule 56(f), to allow the Government to conduct discovery regarding the following issues: American Airlines' diligence in collecting user fees; refusals by American Airlines' passengers to pay user fees; and the steps that American Airlines has taken to confirm collection or noncollection of particular amounts. *See* Gov't Resp. at 24–25; *see also* RCFC 56(f). As discussed, herein, these factual issues are not material to the court's resolution regarding liability.