# United States Court of Appeals for the Federal Circuit

2007-5174

AMERICAN AIRLINES, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Adam P. Feinberg, Miller & Chevalier Chartered, of Washington, DC, argued for plaintiff-appellee.

Kyle E. Chadwick, Senior Trial Counsel, Commercial Litigation Branch, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Jeffrey S. Bucholtz, Acting Assistant Attorney General; and Jeanne E. Davidson, Director. Of counsel on the brief were Andrew S. Kosegi, Attorney, U.S. Customs and Border Protection, of Indianapolis, Indiana; and Cynthia A. Koch, Senior Counsel, United States Department of Agriculture, of Washington, DC.

Appealed from: United States Court of Federal Claims

Judge Susan G. Braden

# United States Court of Appeals for the Federal Circuit

2007-5174

AMERICAN AIRLINES, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Appeal from the United States Court of Federal Claims in Case No. 04-CV-1736, Judge Susan G. Braden.

_____

DECIDED:  December 22, 2008

_____

Before NEWMAN, MAYER and SCHALL, Circuit Judges.

NEWMAN, Circuit Judge.

This action was brought by American Airlines, Inc. ("American") in the United States Court of Federal Claims, claiming that the United States unlawfully required American to pay to the government the full amount of "user fees" that American had been unable to collect from passengers.  The Court of Federal Claims ruled that the government illegally exacted these sums from the airline, American Airlines, Inc. v. United States, 68 Fed. Cl. 723 (2005), and that the amount exacted should be refunded,

with interest, American Airlines, Inc. v. United States, 77 Fed. Cl. 672 (2007). The government appeals both rulings.

BACKGROUND

At issue are two fees imposed on persons entering the United States: the Immigration Inspection User Fee and the Agricultural Quarantine Inspection User Fee. Both fees are based on the principle that government services should be paid for by the users of the services.

The purpose of the Immigration Inspection User Fee is to cover the cost of various immigration inspection services. The authorizing statute, 8 U.S.C. §1356(d)-(k), was enacted in 1986 and provides (with certain exceptions not here relevant) that each passenger entering the United States on a commercial carrier shall pay a fee for immigration inspection. See 8 U.S.C. §1356(d) ("In addition to any other fee authorized by law, the Attorney General shall charge and collect $7 per individual for the immigration inspection of each passenger arriving at a port of entry in the United States . . . ."). Generally the fee is collected by the issuer of the ticket at the time of issuance. Id. §1356(f)(1). If the ticket is issued in a foreign country and the fee is not collected at ticketing, then the carrier is required to collect the fee at the time the passenger departs from the United States. Id. §1356(f)(2). The person who collects the fees pursuant to §1356(f)(1) or (2) is required to remit the collected fees quarterly to the Attorney General. Id. §1356(f)(3). All commercial tickets are required to be marked to show the user fee status. Id. §1356(f)(1)(B); 8 C.F.R. §286.4(b).

The regulations provide further details about the Immigration User Fee, at 8 C.F.R. §§286.1-286.7. The regulations relevant to the issues herein include the following (with emphases added):

> 8 C.F.R. §286.4 Fee collection responsibility
> (a) <u>It is the responsibility of the air or sea carriers</u>, travel agents, tour wholesalers, or other parties, which issue tickets or documents for transportation on or after December 1, 1986, <u>to collect the fee</u> set forth in §286.2 of this part from all passengers transported to the United States who are not excepted under §286.3 of this part.
> (b) Tickets and documents for transportation shall be <u>marked by the collector of the fee</u> to indicate that the required fee has been collected. Such markings shall be in accordance with the procedures set forth in the ARC Industry Agents Handbook, the SATO Ticketing Handbook, or compatible procedures set forth in the operations manual of individual collectors.
> (c) <u>It is the responsibility of the carrier</u> transporting a passenger from the United States <u>to collect the fee upon departure</u>, if the passenger was not excepted under §286.3 of this part and tickets or documents for transportation of the passenger do not reflect collection of the fee at the time of issuance. <u>If at the time of departure such a passenger refuses to pay the fee</u>, the carrier shall record the full name, complete address, nationality, passport number, and alien file number, if any, of the passenger and immediately <u>notify the Associate Commissioner, Finance</u>.
>
> 8 C.F.R. §286.5 Remittance and statement procedures
> (a) <u>The air or sea carrier whose ticket stock or document for transportation reflects collection of the fee is responsible for remittance of the fee</u> to the Service. The travel agent, tour wholesaler, or other entity, which issues their own non-carrier related ticket or document for transportation to an air or sea passenger who is not excepted from the fee pursuant to §286.3 of this part, is responsible for remittance of the fee to the Service, unless by contract the carrier will remit the fee.

The regulations also require an air carrier to maintain records of fees collected and remitted, 8 C.F.R. §286.6, and provide the government with enforcement powers including independent audits, <u>id.</u> §286.5(f), subpoena power, <u>id.</u> §286.5(g), and penalties against the carrier for noncompliance, specifically, termination of contracts

and suspension of enroute inspections or preinspections, id. §286.7.  The regulations do not provide a penalty against passengers who refuse to pay the fees.

The second fee at issue is the Agricultural Quarantine Inspection (AQI) User Fee, enacted in 1990 and codified at 21 U.S.C. §136a.  This fee is intended to cover the cost of providing agricultural quarantine and inspection services to airline passengers entering the United States.  21 U.S.C. §136a(a); see 7 C.F.R. §354.3(f)(1) ("[E]ach passenger aboard a commercial aircraft who is subject to inspection . . . upon arrival from a place outside of the customs territory of the United States, must pay an AQI user fee.").  Much like the Immigration User Fee provisions, the AQI regulations require collection of the fee by the carrier or other agent, and remittance as instructed.  See 7 C.F.R. §354.3(f)(4)-(5).  Again, tickets are marked to show collection of the fee.  Id. §354.3(f)(4)(i)(A).  The relevant regulations include the following (with emphases added):

> 7 C.F.R. §354.3(f)(4)  Collection of fees
>     (i) Any person who issues tickets or travel documents on or after May 13, 1991, is responsible for collecting the AQI user fee from all passengers transported into the customs territory of the United States to whom the AQI user fee applies.
>         (A) Tickets or travel documents must be marked by the person who collects the AQI user fee to indicate that the required AQI user fee has been collected from the passenger.
>         (B) If the AQI user fee applies to a passenger departing from the United States and if the passenger's tickets or travel documents were issued on or after May 13, 1991, but do not reflect collection of the AQI user fee at the time of issuance, then the carrier transporting the passenger from the United States must collect the AQI user fee upon departure.
>
> 7 C.F.R. §354.3(f)(5)  Remittance and statement procedures
>     (i) The carrier whose ticket stock or travel document reflects collection of the AQI user fee must remit the fee to the U.S. Bank, United States Department of Agriculture (USDA), APHIS, AQI, P.O. Box 979044, St. Louis, MO 63197-9000.  The travel agent, United States-based

> wholesaler, or other entity, which issues its own non-carrier related ticket or travel document to a passenger who is subject to an AQI user fee under this part, must remit the fee to APHIS, unless by contract the carrier will remit the fee.

A "compliance" provision allows the Animal and Plant Health Inspection Service (APHIS) to verify the accuracy of fees that are collected and remitted. Id. §354.3(f)(7).

American has duly collected and made regular remittances of both of these user fees. American explains that typically a very small percentage of user fees is not collected, for various reasons. For example, some tickets are issued by foreign travel agents in countries that prohibit ticket agents from collecting United States user fees at the time of ticketing. While the user fee statutes and regulations provide that the airline shall collect any unpaid fees before such a passenger boards an aircraft to leave the United States, American states that the airlines cannot force passengers to pay the user fees at the point of departure because the airlines are not authorized to refuse to board ticketed passengers who refuse to pay these fees.

American's records and payments were audited by the government on an annual or biannual basis. According to the government's audit methodology, a sampling of tickets from American's flights during a specific time period was checked for marking or other evidence that the user fees were collected. Tickets lacking such evidence were placed on a list of "potential errors," which American then researched to determine whether any other evidence showed that the user fees were collected for the "potential error" tickets. Any ticket whose fee status was not resolved after such further research was deemed a "confirmed error," which the government audit treated as a ticket for which user fees were not collected. The error rate, measured as the ratio of "confirmed error" tickets to the total number of sampled tickets, was then multiplied by the total

dollar amount of fee remittances by American during the relevant time period, to approximate the shortfall in collected user fees. During the audit periods at issue, the aggregate error rate for these user fees as audited was less than 1%.

The government assessed American for the amount of the approximated shortfalls in collected user fees as audited, and American paid the assessed amounts for each audit period. American objected to the user fee assessments in October 2003, and wrote the responsible agencies requesting refunds. The agencies declined the requests in August 2004. In December 2004, American filed suit in the Court of Federal Claims. American's complaint states that the assessments were "illegally exacted by the defendant under the pretence that statutory and regulatory authority relating to the remittance of Immigration User Fees and Animal and Plant Health Inspection Service Fees by airline carriers requires the carriers to remit a 100 percent collection rate of such fees or assume secondary liability or guarantor status for such uncollected fees." Compl., preamble. The complaint, as amended, presents the details of the audit-based assessments from October 1998 to August 2004, with a total of $2,267,974 in payments. American requested recovery of this sum, plus interest and penalties.

Both parties filed dispositive motions on the question of liability for illegal exactions, deeming it to be a matter of law. The Court of Federal Claims granted partial summary judgment to American, ruling that the carrier is required to remit to the government only those fees that are actually collected from passengers. The court found the user fee statutes and regulations unambiguous, and explained that liability for payment of the user fees "is imposed on the passenger, not upon commercial airlines that are required only to collect and to remit any fees collected." American Airlines, 68

Fed. Cl. at 732. The court held that the government's liability theory imposes an unauthorized penalty on the carrier. After a period of discovery on damages, during which the court granted a protective order precluding certain of the government's broad discovery requests, reported at 75 Fed. Cl. 237, 241 (2006), and after briefing and argument, the court accepted the unopposed damages calculation by American's expert and awarded American a total of $2,601,373 in damages and interest.

On this appeal, the government argues that the Court of Federal Claims erred both in holding that the assessments were illegal exactions and, even if the liability ruling were correct, in measuring recovery by the amounts that were assessed and paid based on the government's audits. These arguments are addressed in turn.

I

LIABILITY

The government argues that the user fee statutes and regulations, correctly interpreted, obligate the carriers not only to collect user fees from all passengers and to remit all fees collected, but also to pay the fees that the airlines do not collect. The government states that the two agencies that administer these fees have construed the statutes and regulations in this way for more than a decade, and hence, to the extent the governing provisions are deemed to be ambiguous, these agency interpretations are entitled to deference. The Court of Federal Claims held that the statutes and regulations are not ambiguous, and that they have been incorrectly applied. The government acknowledges that the interpretation of statutes and regulations is a question of law, which we review independently, e.g., Demko v. United States, 216 F.3d 1049, 1052 (Fed. Cir. 2000), and argues that judicially crafted doctrines of deference to

agency interpretations require reversing the judgment and sustaining the agencies' view.

In construing a statute or regulation, we begin by reviewing its language to ascertain its plain meaning. Glover v. West, 185 F.3d 1328, 1332 (Fed. Cir. 1999). When a statute is not clear on its face or does not speak directly to an issue, the interpretation provided by the relevant agency's regulations warrants deference, in keeping with Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45 (1984). On the other hand, when the statutory text is clear, we need look no further. Id. at 842-43 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."); see also, e.g., Shoshone Indian Tribe of the Wind River Reservation v. United States, 364 F.3d 1339, 1345-46 (Fed. Cir. 2004). When the language of a regulation is ambiguous or susceptible to more than one plausible reading, we defer to the agency's interpretation of its own regulations, as discussed in Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945). See also Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) ("[W]e must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." (citation and quotation marks omitted)). As explained infra, we agree with the Court of Federal Claims that the plain language of the user fee provisions at issue here in both the statute and regulations is clear on its face, and accordingly no deference is owed to the agencies' interpretations.

The Immigration User Fee statute states that the Immigration User Fee is imposed on the passenger, not on carriers. 8 U.S.C. §1356(d) ("In addition to any other fee authorized by law, the Attorney General shall charge and collect $7 per individual for the immigration inspection of each passenger arriving at a port of entry in the United States . . . ."). The statute provides two avenues for collection: upon passenger ticketing for travel to the United States or, for those who did not pay the fee upon ticketing, then prior to boarding a flight departing the United States. See id. §1356(f)(1)-(2). The responsibility to collect the fees is typically on the carrier or agent, as the "person who issues a document or ticket" in the first case, or upon "the person providing transportation to such passenger" in the second. Id. The Court of Federal Claims observed that the plain language of the statute requires the carrier or agent that collects fees in these ways to remit only the fees that are actually collected: "The person who collects fees under paragraph (1) or (2) shall remit those fees . . . ." Id. §1356(f)(3). The words "those fees" plainly refer to the fees collected under paragraph (1) or (2), not a theoretical total of all fees for all passengers whether or not collected.

The regulations promulgated under the Immigration User Fee statute are also unambiguous. They require the carrier to remit a fee when the carrier's "ticket stock or document for transportation reflects collection of the fee," 8 C.F.R. §286.5(a), with the date of remittance governed by the time at which "the fees are collected," id. §286.5(b)(1). These regulations explicitly recognize the possibility that some passengers may refuse to pay the fee, as shown in the emphasized language in 8 C.F.R. §286.4(c), ante, and for such instances the regulations require that the carrier

record the name and other identifying information of each refusing passenger and immediately inform the Associate Commissioner, Finance.[1]

The regulations impose detailed obligations on the air carriers, and state specific penalties for noncompliance, but do not impose upon the carriers the obligation to pay uncollected fees. The regulations require recordkeeping as to the fee imposition and collection and marking on the tickets, id. §286.5(c), and provide for government audits and other enforcement mechanisms, id. §286.5(f)-(g); these provisions would have no purpose if the statute simply required the carriers to pay the fees for all passengers, whether or not they are collected. The regulations are wholly consistent with the plain meaning of the statute as held by the Court of Federal Claims, and inconsistent with the interpretation pressed by the government.

The AQI User Fee statute is somewhat less detailed than the Immigration Inspection User Fee statute, but the regulations prescribed by the Secretary of Agriculture, as authorized by 21 U.S.C. §136a(a),(d), are unambiguous in their imposition of the obligation to pay the AQI fee directly on the passenger. 7 C.F.R. §354.3(f)(1) ("[E]ach passenger aboard a commercial aircraft who is subject to inspection . . . upon arrival from a place outside of the customs territory of the United States, must pay an AQI user fee."). The AQI regulations state that the carrier or ticket agent "is responsible for collecting" the fees from passengers, id. §354.3(f)(4), and require remittance of fees that are actually collected, id. §354.3(f)(5)(i) ("The carrier whose ticket stock or travel document reflects collection of the AQI user fee must remit

---

[1] This title refers to a position in the Immigration and Naturalization Service, which was dissolved in 2003. Customs and Border Protection, a component of the Department of Homeland Security, now has responsibility for the immigration inspection process. See 6 U.S.C. §§251(5), 291(a).

the fee to the U.S. Bank, [USDA], APHIS . . . .").  The regulations also require documentation of the fees that are collected and remitted, id. §354.3(f)(5)(iii), and include "compliance" provisions allowing "APHIS personnel to verify the accuracy of the AQI user fees collected and remitted," id. §354.3(f)(7).  Again, these detailed provisions would serve no purpose if the Secretary could simply assess air carriers for the total number of passengers carried.

American points out that APHIS itself acknowledged this clear meaning when it amended the AQI user fee regulations in 1992, in response to complaints that a separate aircraft inspection fee alongside the AQI User Fee constituted "double billing." APHIS explained, as to the existing AQI user fee:

> It is also relevant that passengers themselves pay the APHIS user fees for passengers.  Airlines are not responsible for paying passenger fees, though they collect the fee along with the price of the ticket, taxes, and any other charges that apply, and then remit the APHIS user fee to APHIS.

User Fees—Agricultural Quarantine and Inspection Services, Phytosanitary Certificates, Animal Quarantine Services, Veterinary Diagnostics, Export Health Certificates, 57 Fed. Reg. 755, 764 (Jan. 9, 1992) (codified at 7 C.F.R. pt. 354; 9 C.F.R. pt. 130).  This statement by the responsible agency directly undermines the government's position, pressed on this appeal, that the agency has always understood that the airlines are responsible for paying uncollected passenger fees.  Even were some deference appropriate, an agency interpretation that conflicts with any earlier agency "interpretation is entitled to considerably less deference than a consistently held agency view." Thomas Jefferson Univ., 512 U.S. at 515 (quotation marks omitted).

Nonetheless, the government argues that the AQI regulations require that the

airlines "must remit" AQI user fees "from <u>all</u> passengers . . . to whom the AQI user fee applies." United States Br. 29. The government thus argues that the airlines' obligation is to pay fees for every passenger, regardless of whether every passenger paid the fees. The government arrives at this reading by splicing words and clauses to present a reading divergent from the clear language of the statute. That is not a proper method of statutory interpretation.

The government also argues that American and other air carriers acquiesced for several years in the agencies' interpretations, and paid the assessments for uncollected fees for many years without seeking legal relief. The government states that this acquiescence supports the reasonableness of the agencies' interpretations. Indeed, deference is owed to a reasonable agency interpretation of its own regulations, unless it is contrary to the plain language or "other indications of the Secretary's intent at the time of the regulation's promulgation." <u>Thomas Jefferson Univ.</u>, 512 U.S. at 512 (quoting <u>Gardebring v. Jenkins</u>, 485 U.S. 415, 430 (1988)). But here both the plain language of the regulations and APHIS's prior inconsistent statements upon amending the AQI user fee regulations in 1992, <u>see</u> 57 Fed. Reg. at 764, weigh against the government's interpretation. The government is correct that the reasonableness of an agency interpretation is supported when it has been consistent over time, <u>see, e.g.</u>, <u>Good Samaritan Hosp. v. Shalala</u>, 508 U.S. 402, 417 (1993), but a period of acquiescence does not of itself support enhanced deference. American points out that in the tax context, refund claims are allowed for several years after the tax was paid, even if no objection was previously raised.

Failure to challenge an improper agency action does not ratify such action or insulate it from later objection and litigation. See Swift & Courtney & Beecher Co. v. United States, 111 U.S. 22, 29 (1884) ("illegal fees exacted by a collector, though sanctioned by a long-continued usage and practice in the office, under a mistaken construction of the statute, even when paid without protest, might be recovered back on the ground that the payment was compulsory and not voluntary" (citing Ogden v. Maxwell, 18 F. Cas. 613 (C.C.S.D.N.Y. 1855))). By referring to American's apparent acquiescence for some years before raising its objection, the government appears to be suggesting that American waived the right to object. This question was raised, unsuccessfully, before the Court of Federal Claims. See American Airlines, 77 Fed. Cl. at 681. We discern no reason to disturb the court's holding.

The issue of secondary liability for monies air carriers are assigned to collect from passengers has arisen before, primarily in tax cases. For example, in Air Tour Acquisition Corp. v. United States, 781 F. Supp. 669 (D. Haw. 1991), which relates to an excise tax imposed on the "buyer" of air transportation under 26 U.S.C. §4261, the court held that the "seller," Air Tour, was not liable for underpayment of tax because a plain reading of the statute and Internal Revenue Service (IRS) rulings "all indicate that the buyer, and not the seller, of the transportation is liable for the tax." 781 F. Supp. at 672. The court similarly held that related statutes requiring providers of air transportation to "collect" any taxes due under §4261 and to hold any amount so collected in trust did not impose liability on the transportation provider for taxes it did not collect. Id. at 673-74. The Court of Appeals for the First Circuit reached a similar conclusion in Turks Head Club v. Broderick, 166 F.2d 877 (1st Cir. 1948), which

involved a social club's collection of taxes on club dues, imposed under the then-existing Tax Code. The statute provided that the club receiving dues "shall collect from such members the amount" of the tax and that "taxes collected . . . shall be paid to" the IRS. I.R.C. §1715(a),(b), 53 Stat. 1, 192 (1939). The club collected and paid the taxes to the IRS, but sued for a refund. The court concluded that only the members could file for a refund, in the absence of a power of attorney authorizing the club to act on their behalf, because "[t]he tax in question is laid upon the dues-paying members, . . . not upon the club. . . . [T]he club is not liable for the tax if a member refuses to pay it or if for any other reason the tax cannot be collected from such member." 166 F.2d at 881 (citations omitted).

American states that these authorities support its position, for the statutory texts of the regimes for collecting and remitting taxes in these cases are analogous to the user fee provisions at issue here. The government responds that these tax cases are inapplicable because user fees are not taxes, and thus tax law authorities do not apply; however, the plain language of analogous statutory language is normally read in the same way. In the only other Court of Federal Claims decision to discuss the user fees at issue here, the court held that Air Tour was persuasive authority, based on the similarity of the tax statute there at issue to the user fee statutes. See Continental Airlines, Inc. v. United States, 77 Fed. Cl. 482, 483-84, 486 (2007). American points out that the statute in Air Tour was amended in 1997 to make air carriers liable for excise taxes they fail to collect; the amended statute continues to impose the tax on passengers, 26 U.S.C. §4261, but also provides that if the tax "is not paid at the time payment for transportation is made" and not otherwise paid by the passenger, then

"such tax shall be paid by the carrier providing the initial segment." Id. §4263(c). Similarly, a statute imposing a new security fee after the events of September 11, 2001 calls for the air carrier to collect the fee, but expressly states that if the fee "is not collected from the passenger, the amount of the fee shall be paid by the carrier." 49 U.S.C. §44940(d)(2). American states, and we agree, that these clear examples of the imposition of liability on the carriers are quite distinct from the statutory language here at issue.

We affirm the ruling that the statutes and regulations governing the Immigration User Fee and the AQI User Fee do not impose liability on the carrier for payment of the fees that are not actually collected from passengers.

II

REMEDY

The government next argues that the Court of Federal Claims erred in its damages ruling. The government does not allege error in the award calculation itself, based on the damages theory adopted by the court, but rather asserts that the theory of damages was unduly restricted, as implemented by a discovery ruling precluding discovery requests that extended beyond the government's audit results and reached more broadly into American's internal methodology for collecting and accounting for fees. The government contends that it was improper to limit the damages inquiry to the audit results upon which its unlawful exactions were actually based, and that the proper focus should have been on the entirety of American's fee collection and remittance process to determine whether American's payments truly exceeded its overall liabilities.

In the Court of Federal Claims the government sought broad discovery on

damages, arguing that it should not be bound to its earlier audit results. It requested that its damages firm be allowed "ordinary civil discovery" to examine, on a sampling basis, American's methodology and controls for its collection of user fees. The Court of Federal Claims granted the government's request for additional discovery, but limited it to three months. During this period, American moved for a protective order with respect to certain of the discovery requests, in which the government sought to examine the way American allocated taxes and fees that were encoded on some of its tickets using certain indeterminate code letters. The government focused on what is described as American's allocation methodology for its composite "XT" and "ZZ" codes.

American explained that it uses the industry standard method for indicating collected fees on its tickets, as the government auditors had recognized, and that the extensive additional information the government sought was unnecessary as well as unduly burdensome. American explained that in accordance with the industry standard, it uses two-letter codes on its tickets to denote when various taxes, fees, or charges have been collected. For instance, the AQI and Immigration User Fees are denoted by "XA" and "XY" respectively. However, the standard ticketing format provides space for only three such codes; when more than three separate taxes or fees are collected for a particular ticket, then, pursuant to the standard instructions promulgated by the airline industry association, American uses a composite code to represent multiple taxes or fees that cannot be separately listed. Two such composite codes, "XT" and "ZZ," and the methodology American uses to allocate various funds represented by those composite codes, were the subject of the challenged discovery requests. American uses a sampling methodology for the small number of tickets for which the funds pooled

under a composite code cannot be properly assigned based on other documentation. American researches a sample of these tickets to figure out which specific fees or taxes were associated with the tickets, and uses this sampling data to proportionally allocate all funds accounted for under indeterminate composite "XT" and "ZZ" codes among the proper tax or fee accounts. American argued that all of this information had previously been provided to the government auditors, who found no error in American's allocation methodology, and that this allocation methodology had no relation to the count of "confirmed error" tickets on which the challenged illegal exactions had been predicated.

The Court of Federal Claims granted American's protective order, precluding the government from further probing into American's allocation methodology for the composite "XT" and "ZZ" codes. The court stated that the government had filed an Answer, after repeated extensions, without pleading any setoff defense or counterclaim, and that the time to seek discovery to establish a minimum factual basis for pursuing such a setoff against American's damages had long since passed, rendering any such defense or counterclaim waived. The court thus ruled that the damages question was limited to the actual amount that American had paid pursuant to post-audit assessments; that is, the amounts paid based on the audit of "uncollected" fees.

The government conceded that the calculations based on the analysis of American's damages expert, David Williams, were correct on the information available. Mr. Williams reviewed the "confirmed error" tickets on which the unlawful assessments were predicated, and identified one group of tickets for which additional inquiry showed that the user fees had actually been collected, which accounted for $38,611 of the assessed amounts. Williams accordingly subtracted this $38,611 sum from the audited

total of $2,627,974 to arrive at a net of $2,589,363 in payments for uncollected fees. The government did not present any expert testimony or documentary evidence on the damages question, and declined to depose or cross-examine Mr. Williams. Accordingly, the court awarded American $2,589,363 in principal amount and $12,010 in pre-judgment interest, resulting in a total judgment of $2,601,373.

The government argues that the damages inquiry should not have focused solely on the amounts assessed based on the audits, but should have provided the government with the opportunity to reinvestigate all of American's fee collections and remittances, which totaled more than $558 million over the relevant period. The government contends that such a broader inquiry might have uncovered other errors in American's procedures, not identified during the audits, which could have resulted in underpayments of fees that it had actually collected. The government argues that its prior audits are not conclusive, and should not have prevented the requested broad discovery. The government analogizes to tax refund cases, where the plaintiff bears the burden of establishing that its total payments exceeded its total liabilities for its entire tax return. Thus the government argues that American had the burden of establishing that the audits were correct.

American responds that this is not a tax refund case, and there is no general authority for allowing the government to disavow its own audits and revisit every payment of fees, without some concrete and positive evidence that its own audits were incorrect. American argues that no such showing has been made, even in a preliminary manner. The methodology by which the prior audits were conducted had been designed by the government auditors, and no question had been raised by the

government as to the correctness of the audits that it had conducted. American states that the same processes into which the government sought renewed discovery were within the scope of the prior audits, and that the government had never raised any concerns with American's allocation methods for composite codes. American thus argues that the Court of Federal Claims did not abuse its discretion in limiting discovery, and did not err in its damages award.

The government relies on tax refund principles, wherein, although the taxpayer may have disputed only one specific aspect, the entire tax liability may be reopened by the government. This practice derives from Lewis v. Reynolds, 284 U.S. 281, 283 (1932), in which the Court held that the IRS can offset a taxpayer's claim for refund based on an improperly denied deduction, by showing that a separate deduction in the same tax return had been improperly allowed. The Lewis offset rule applies even where the statute of limitations would have prevented the Commissioner from reassessing the tax to recover the improperly allowed deduction. Id. The Court held that this offset rule was "necessarily implied" by the specific statutes providing for refund suits. In Dysart v. United States, 340 F.2d 624, 628 (Ct. Cl. 1965), the Court of Claims explained that under the Lewis rule, the Commissioner has the right to raise setoff defenses to challenge the taxpayer's assertion that he overpaid his tax. The government draws analogy between American's "illegal exaction" claim and a claim that taxes have been improperly collected, which is "the classic illegal exaction claim," Norman v. United States, 429 F.3d 1081, 1095 (Fed. Cir. 2005), and argues that the law and practice of tax cases, including the placement of the burdens of proof and the principle of setoff, should be applied here.

There is considerable tension in the analogy to tax refund cases, for the government flatly asserts that the user fees are not "taxes," but are fees imposed on the users of certain services to cover the cost of providing those services. Indeed, in its discussion of the liability ruling, the government states: "There is no reason to construe or apply <u>user</u> <u>fee</u> provisions as if they were parts of the Tax Code or Treasury Regulations. User fees are not taxes." United States Brief 25. In <u>Pacific Gas & Electric Co. v. United States</u>, 417 F.3d 1375 (Fed. Cir. 2005), this court specifically declined to extend <u>Lewis</u> and <u>Dysart</u> to apply outside of the "integrated and comprehensive statutory scheme for assessing, collecting, and refunding taxes, deficiency interest, and penalties" under the tax code. <u>Id.</u> at 1383. There is no support in tax principles or precedent for the government's proposal to redo its audits during litigation.

The question in this case is quite different. The question is not whether the government is entitled to verify, by government audit, the procedures employed by American and the results thereof. That has been done. The question is whether, having done so, regularly and repeatedly, the government has the absolute right during litigation to redo its own audits in order to search for possibly overlooked information. We have been directed to no rationale for such redundancy, no apparent error or flaw in the government's methodology, or other basis for expecting that significant adjustment in favor of the government would ensue. Even in the tax refund claim context, the government "must possess 'concrete and positive evidence' before it initiates discovery into matters relevant only as to establishment of offsets." <u>Mahoney v. United States</u>, 223 Ct. Cl. 713, 718 (1980). As the <u>Mahoney</u> court further stated, in an order amending its prior decision, "[t]here is no magic about offsets to make it less of an abuse to assert

offsets, supported only by a hope to substantiate them by discovery, than it would be to assert any other claim or defense with only a similar hope." 224 Ct. Cl. 668, 669 (1980). The government had ample opportunity to broaden the scope of the litigation by raising good-faith allegations by way of counterclaim or affirmative defense, but chose not to do so. The government simply has not raised any well-grounded allegation of a deficiency in any of the quarterly remittances American made that would justify the invasive discovery it seeks into the accounting procedures underlying those remittances.

The government argued in the Court of Federal Claims, and repeats on this appeal, that it should not be bound by its own audits and the absence of a pleaded counterclaim or setoff defense in order to support the requested discovery into matters previously audited by the government. However, the government has made no reasonable showing that it possesses "concrete and positive evidence, as opposed to a mere theoretical argument," Sara Lee Corp. v. United States, 29 Fed. Cl. 330, 338 (1993) (quoting Missouri Pac. R.R. v. United States, 338 F.2d 668, 672 (Ct. Cl. 1964)), to justify wide-ranging discovery on a quest for setoffs. No error has been identified in the government auditor's methodology, despite the three months of additional discovery that the court afforded. The Court of Federal Claims did not abuse its discretion in the limitations that the court placed on additional discovery. See Forest Products, Northwest, Inc. v. United States, 453 F.3d 1355, 1359 (Fed. Cir. 2006) (discovery rulings are within the trial court's discretion).

The amounts assessed were based on the government's periodic audits, and the assessments were paid by American. American's damages expert, reviewing the results during this proceeding, identified a small error in the government's favor, and the

claim was reduced accordingly. The court's damages award was based on this expert report, which the government stipulated was accurate. No error has been shown in the judgment of the Court of Federal Claims.

AFFIRMED